Our next case this morning and our second and last is Howle v. Aqua Illinois, Inc. and Robert Chitwood. 4-12-0207. For the appellant is William DiPella. I'm Daniel Jones. Daniel Jones. Okay. Well, thank you, Mr. Jones. Let me make a note. And for the appellee is Michael Stiff. You are he, sir? Correct. Thank you. Thank you. Okay. Mr. Jones, you may proceed. Your Honors, may it please the Court. Counsel. My name is Daniel Jones and I represent the plaintiff appellant Linda Howle. Your Honors, the purpose of the Animal Control Act is to encourage tight control of animals in order to protect the public from harm. And since the overriding purpose of the Act is to protect the public from harm, the Animal Control Act imposes penalties both on the owner of the animal and anyone that acts and places themselves in a position of control over the animal. As such, the courts have told us that the courts must carefully weigh the specific facts of each case when making a decision involving the Animal Control Act. When the specific facts of this case are examined, the court's going to see that there are genuine issues of material fact as to whether Aqua Illinois, Inc. has acted with control over the dogs owned by its employee, Robert Shipwood. And as such, we're going to ask for a reversal of the lower court's decision to dismiss count two of the plaintiff's complaint and the grant of summary judgment of count four of the plaintiff's complaint. Is your essential averment in this case that based upon the particular facts and circumstances regarding Mr. Chipwood's residence on the Aqua Illinois ground and the circumstances of what was going on with regard to the other dogs, that for purposes of the Animal Control Act, he was an owner? And for purposes of common law negligence, he should be deemed an owner as well? Yes, Judge. As far as the Animal Control Act is concerned, there are four things a petitioner has to approve in an Animal Control Act case. And really the only issue here is ownership. The plaintiff has to prove that the injury was caused by an animal owned by the defendant. And the Act defines owner in a much broader sense. And I think the case law tells us this. But Section 2.16 of the Act defines an owner to be any person having a right of property in an animal or the harborer or keeper of an animal or one who has it in his care or its custody or who knowingly permits a dog to remain on a premises occupied by him or her. And when you start with the Animal Control Act, first of all, I think that last phrase, knowingly permits a dog to remain on a premises occupied by him or her, applies in this situation. In this case, Mr. Chipwood rented a premises from his employer, Aqua, on a piece of property that was completely enclosed upon the Aqua property. They owned it all. There was a fence around it. There was barbed wire around the fence. There was access controlled at the single entrance by a gate. You either had to have a pushpad number to get in or you had to get approval from the plant manager from an intercom. And so it's not only that he lived there, but they were on a premises occupied by Aqua, Illinois. But it's also more than that. It's the ownership that they demonstrate and act in control over these animals. And they exercise ongoing and continuous control over these animals. And that is shown by the actions that are taken. First of all, the premises itself, the residential premises which Mr. Chipwood rented, was part of the Aqua property. And, again, Aqua had complete control over the access to the property. But they also did other things to maintain control over the property. They mowed the grass. They plowed the driveway. They fixed the roof. They actually replaced the roof, and they did all the electrical and mechanical repairs on the property. If I owned a 60-unit apartment building and one of my tenants, Mrs. Brown, had a little dog named Fluffy, and Fluffy bit somebody, am I going to be liable? It depends on how much control you retain over the property. And there are cases about landlords and tenants that tell us, first of all, in the common law setting, if the landlord maintains any sort of control over the property, yes, you can be on the hook. And you also have to go through the other things in common law. You have to prove a knowledge of the dog's propensity. But as far as the animal control act. How about just the scenario he gave you? Under the act or under common law? Either. Okay. The scenario you just gave us, if he retains control over the premises, yes. And there are cases out there, and the Steinberg case is in the briefs and will be talked about, I'm sure, is the case where the classic absentee landlord had no idea that the dog was there or that anything was going on. His manager of the apartment said, you can keep a dog there. And under that case, there was no liability found. But that's not the case here. And in your scenario, I think you need to know more facts than. Well, under his scenario, then, why isn't the answer the same as in Steinberg, no liability? All the landlord knew is that one of his 60 tenants has a dog. And if that's all he does, there's no liability. I think Steinberg is clear on that. But that's not the case we have in front of us. So what beyond knowledge is here in this case? I'm sorry? What beyond knowledge of the dog being present is in our case here? In our case here, we have actual control over both the property and the dogs. And we see the property being more than I've rented you an apartment and, yeah, I know you have a dog there. We actually see control over the property and over the dogs. And most importantly, we see it over the dogs. What control over the dog, Sage, did Aqua Illinois exert? The same control that they exerted over all the other dogs. And when Mr. Chitwood was called in for his meeting with his boss and his supervisor, Mr. Gapehart, and they knew about Sage because Mr. Gapehart had been at Mr. Chitwood's residence to play cards before this all happened. They had a meeting with him, and there was an ultimatum given on August 12th of 2008. And then there's a memo created by Mr. Bruns, the vice president, on August 13th. And they talk about the ultimatum that was given to Mr. Chitwood. And it's to maintain your dogs. It's not to maintain this dog as opposed to that dog. It is to maintain your dogs. And if there is one more incident involving your dogs, then you will be out of here. So the threat to terminate his lease is enough to establish control under the act? I don't think it's enough alone, but we have more than that. We have a right to control not only his lease, but we have a right to control his employment, which is there on the property. And they also exercise the right to control the dogs. And when they met with him on August 12th, they told him, if you have any more problems with these dogs, either the dogs are going to go or you're going to go. And Mr. Chitwood testified in his deposition that I understand that. I understand they have that power over me. And if Mr. Bruns tells me the dogs have to go, I understand they have to go. And more than that, we see exactly how much control they have over the dogs after the incident happens, because once Mr. Bruns learns of this incident on February 11, 2009, they throw him out of the house. They terminate his lease, and Mr. Bruns testified, this is the only reason I did it. It was because of this accident or this incident. And although this subsequent remedial measure would probably not be allowed in most cases on our rules of evidence, it does come in to show the amount of control they had over here. And it belies the claim by the defense that ACWA didn't have any control over what happened inside the premises. They clearly did because they threw him out of the house based on this incident that happened inside the premises. So it's more than control over the leasehold. It's even more than control over his job. It's that we exercise ongoing and continuous control over this property. Your client argued to the court that the only disputed relevant issue is whether ACWA qualifies as an owner of the dog under the act. Correct. Regarding Cart 2. I don't think the others are disputed. The defendant filed a motion under 2619.1 that purported to be based on section 2615 and 2619, seeking to dismiss. And with regard to 2615, the trial court denied the motions, but in 2619, granted it as to count two. And that's one of the matters up here on appeal. And then under the common law negligence action, we are here on a summary judgment which was granted as to that. With regard to the motion to dismiss filed under 2619.1 at the trial level, did you make any objection to it on the grounds that it failed to comply with the statute? That the motion itself did? Yes. No, we did not. With regard to 2619, which was the basis for granting the motion, what was the affirmative matter that was cited by the defendant there? And I haven't actually looked at that motion for quite some time, Your Honor, but I believe it was 619A9, any other affirmative matter that would defeat the claim. Well, what was the affirmative matter in this case? That is, from my reading of the motion, it seems that the position of the defendant was, we didn't own the dog. And that's my understanding as well, Judge. How is that affirmative matter? Why isn't that just the negation of an essential claim that you brought in your complaint? I think you can argue that it is. Well, if it is, then why is it being heard as a motion to dismiss under section 2619? And that's an interesting question, Judge. Well, I think it is. And I'm wondering, as plaintiff, did you ever say, wait a minute, this is the wrong vehicle with which to be addressing any of this? We never made that complaint. But, in fact, the analysis used by the trial court regarding the question of, was Aqua, Illinois, the water company, the owner of the dog, was to ask whether there was any genuine issue of material fact. That's correct, Judge. Which would be the summary judgment standard. Judge, and I think what happened is that when the 2619 motion was filed, there was actually an affidavit attached to it. Yes, there was. And there was a 2619.1 motion. Right. Two affidavits. And affidavits were attached, which normally doesn't happen. And actually, at that point, we asked for a deposition to be taken. And I think from then on, it kind of got treated as a summary judgment motion, quite frankly, after that, because we're considering affidavits and depositions and things of that nature. So no one was going to bother to say what the procedural posture should be? No one did, Judge. Well, is there any ‑‑ it seems to me that there is no prejudice to you or to the defendant in treating this as essentially a motion for summary judgment because the standards were the same, were they not? They are the same, I think, Judge. So the trial court concluded with regards to the common law negligence count that there was no genuine issue of material fact and that the defendant was entitled to summary judgment. And is there any reason we shouldn't view the trial court's action purporting to dismiss Count 2 under 2619 as essentially a grant of summary judgment? I think that's what it is, Judge, and I think that's where we're at. Too bad no one talked about that at the trial, though. That is too bad, Judge. Okay. Go ahead. Thank you. When we talk about ‑‑ let's talk about the common law aspect of this. Under Count 4, the common law count, the plaintiff has to prove it's a negligence count. You have to prove duty and breach and proximate cause. And you've also got to prove the extra element that there was a knowledge of the dangerous propensities of the dog. And I think in this case, first of all, our case law tells us that a landlord that retains control of at least a portion of a premises has a duty to use ordinary care and maintain the property, and that would include the dogs here. And so ACWA does have a duty here to these people, even if it is, for instance, that happened inside the home. In addition, there is some knowledge of the dangerous propensities of these dogs. And we see several incidents along the way that happen. Let me go back to Justice Pope's question. It wasn't ‑‑ it's an interesting history of Mr. Chitwood and the dogs, but the dog who actually bit the plaintiff here and caused her injuries was, as I recall, the dog of Chitwood's son who was visiting for a holiday party? Actually, Judge, the son and the dog were permanent residents at that time. Sage was a permanent resident of Mr. Chitwood's home. How long had Sage been a permanent resident? It's not clear. No one really had a specific residence. But by the time this had happened, everyone's recollection was clear that the son and the dog Sage had come to reside there on a permanent basis. I thought Chitwood was equivocal on that, whether he was living there or residing there or permanently. I thought there was some equivocation based on my recollection. I think there was some back and forth. My recollection of Mr. Chitwood's testimony is by the time this incident happened in December of 2008, Justin was living there with Sage on a permanent basis. But to get back to the issue of that particular dog, there is knowledge of the dangerous propensities, and the courts have recognized that scienter can be established by looking at the pattern of behavior that is there and the care of the dog that is given. And what we see from the care of these dogs is that they were allowed to act in a dangerous behavior and that ACWA knew about that. ACWA is aware of the three incidents that involve Frances Richards, the plant treatment operator, where Marley comes at her. Mr. Bruns himself, the vice president, was part of what he referred to as an attack once when he tried to come on the property. There's also an incident involving Charlie Miller, who is a janitor at the place, and he testifies as to several times when the dog Marley comes at him, and he said it's not a matter as if she was going to bite me. It was just a matter of when, and that dog would come at you. But Marley's not the dog at issue. No, but you can assume from the way the dogs are treated, according to our case law, that there is scienter there. There is dangerous propensities that can be assumed, and whether ACWA knew or should have known about the dangerous propensities of these dogs. And I think there's enough there that a jury ought to make those decisions. And that's what the cases tell us, that generally questions about these types of issues are for the trier of fact. And whether it's the Severinsen case under the common law count, or it's Beggs or Thompson under the Animal Control Act counts, generally these questions are for the trier of fact. And there's all kinds of questions out here of genuine issues of material fact, about how much control that ACWA had over these dogs, and how much knowledge they had about the dangerous propensity of these dogs. And whether the jury actually agrees with my position or not, they ought to be the ones that make that decision. It shouldn't be decided as part of a dispositive motion. Getting back to the Animal Control Act then, the facts here show that Mr. Chitwood had these dogs on property that was owned by ACWA, was maintained by ACWA, that ACWA continued to have ongoing and continuous control, even up through the time of this incident. And they actually maintained control, which is also demonstrated by the fact that they tossed Mr. Chitwood out of the property after it happened. And so what we see here are genuine issues of material fact all over the place about whether there was control as defined by the Animal Control Act. These issues ought to be decided by a jury. Your Honor, if you don't have any other questions, that really concludes my presentation, and I thank you for your time. Okay, you'll have an opportunity to address us in rebuttal. Thank you. Thank you, Mr. Jones. Mr. Stiff? May it please the Court? Counsel? Justices of the Court, my name is Michael Stiff. I represent ACWA Illinois, Inc., the defendant in the case. I think what I heard in the plaintiff's presentation is a concession that ACWA was not a harborer, which is part of the definition, that it was not a keeper, it was not a custodian, it was not the actual owner, which is what I call the person who has an actual property right in the animal. I mean, there's no issue here. It is undisputed that either Justin Chitwood owned that dog as the actual owner or Bob Chitwood did. So all that we're left with is the definition, the statutory definition in the Animal Control Act, of knowingly allowing the dog to be kept on premises owned or occupied by him or her. So if that's what we're dealing with, we've got the Supreme Court pronouncement that we're not trying to expand liability here to these tangential people such as landlords. And to follow up on Justice Appleton's question, if your tenant in your 60-unit building, the owner of Fluffy, was walking down the hall and you as the landlord got notice that somebody complained about Fluffy barking or growling or nipping somebody in the hallway, and you said to your tenant, if you don't control Fluffy when she's outside the confines of your apartment, that under the plaintiff's analysis, you would be liable to anything that happened to one of your tenant's invitees at a private party inside the unit. And what we're talking about here when we're talking about control, and again, the Animal Control Act does not define control. It does not even use the word control. Control is what comes from our case law, and the case law is control at the time, the exact moment of the injury, and at the exact location of the injury, and that's the Beggs v. Griffith case. It's not whether you maintain control or ever had control of the animal at some other time. The case cited by the plaintiff, the Steinberg? No, it's the Fourth District case, where there actually was some type of control exercised by the defendant that was akin to the ownership of the dog, and that was the case where the stray dog was brought home by the woman. She then went on vacation or went out of town, and she instructed a neighbor to put out water and food for the dog. It was her intent that if the dog was still around when she came back, that she would take it to the shelter. In that case, the dog ran out in front of a motorcyclist who then wrecked his motorcycle and sued the defendant as the owner of the dog, and in that case, although it was after a bench trial, the court refused to overturn a finding that even with that level of control, the actual physical possession of the dog, taking it home from church, not letting it in your house, but allowing it to roam on your premises, and then instructing the neighbor to put out food or water, things that an owner typically would do, even under those facts, the trial judge found that there was no control under the Animal Control Act, that just that isolated instance of feeding and watering the dog in that one occasion was not enough to make that defendant an owner. And the appellate court said, well, we're not going to overturn that because it was at a bench trial, but it's instructive that even with some measure of control, the courts are reluctant to expand the Animal Control Act beyond what the legislature intended, and that's what, in essence, they're asking here, since we have the Steinberg case, which is a landlord-tenant case, which is completely on point. In that case, the dog was behind a fence and injured a member of the public, and although the tenant or the landlord had noticed that the dog was there through his manager, the Supreme Court said that we declined to extend Animal Control Act liability to landlords under that fact pattern. Let me ask you the same question I asked Mr. Jones. Isn't the essential allegation in this case that the plaintiff has made is that Aqua, Illinois, was the owner of this dog based upon either the Animal Control Act or common law negligence, that the facts as pled lead to that conclusion? Isn't that their essential claim? They have claimed that he's an owner of the dog, that Aqua is the owner of the dog by virtue of the fact that they exercised this control, which, again, they claim to be control over the dogs. In this case, we view that as control over the dogs that they knew of, which were Annie and Marley, but also that it was to control the dogs when they were outside, potentially on premises occupied by Aqua, such as the common areas or the areas of the plant, which, again, were encompassed by a security fence with a gate. And I want to talk about that level of control. Well, I have a question before we get there, and that's about the pleading posture of this case. You filed a 2619.1 motion, combined motion of 2615 and 2619 to dismiss. The trial court denied your 2615 claims, but granted the one under 2619 with regard to the Animal Control Act. What was the affirmative matter you presented there? I was going to get to that, but thank you for reminding me to get to it now. The way the complaint was actually pled did not put the landlord-tenant relationship into issue. They basically said, you owned the house. This guy was allowed to live in it because he was your manager. To get that affirmative matter, to get it within the parameters of Klitschko versus or Steinberg versus PETA, I had to somehow get beyond the four corners of the complaint to allege the affirmative matter that, hey, we're an absentee landlord here. How is that affirmative matter? To be more clear, counsel, it seems to me the basic pleading law under 2619 is when you plead a motion to dismiss under 2619, you're conceding two things for purposes of that motion. One, all the well-pled facts, and two, that the underlying complaint is stated of cause of action, but you're saying, yes, all of that, but you lose for some reason other than negation of the essential elements, such as you have no standing, statute of limitations is run, race judicata applies, the defendant happens to be immune. Which one of those? That's an example of affirmative matter. Now, what's the affirmative matter that is beyond in this case? Well, it's affirmative factual matter, I guess. It's facts that I, at the time that I filed the motion, deemed necessary to establish why I can defeat the claim. Okay. So you're essentially arguing a negation of the essential elements of the claim. Why isn't that a motion for summary judgment, a fact-based pleading, as opposed to attacking the pleading? Well, I think what they pled was merely that we knew or should have known that Chitwood was harboring dogs. If you look at the complaint, there is not even an allegation that we were a harborer. There is not an allegation that we were an owner. There was not an allegation that we were the custodian or keeper. There was not even an allegation that we allowed the dogs to be on premises that we owned. The allegation was that we knew that Chitwood was an owner of dogs. So your affirmative matter is simply Chitwood wasn't or that ACWA wasn't the owner? I guess part of it would play into the negligence count. I mean, I think that there was also that element, because I did move for dismissal with prejudice on the negligence count, that that negated the duty, i.e., the landlord-tenant relationship is a fact that affirmatively negates the duty element of the common law cause of action. Well, the other thing, I noticed you filed a 19-page motion identifying it as under 2619.1, and you asserted four different grounds within your motion. And you don't cite under these arguments, in the first argument, which is eight pages, you don't cite under which section, 2615 or 2619, it's brought. Plus, you also make reference to an affidavit of Tom Bruns, which you say defeats their claim, but the trial court can't consider affidavits or depositions when evaluating a 2615 motion to dismiss. Isn't that the case? This is one of the conundrums that I get into whenever I try to look at the, quote-unquote, hybrid motion under the Code of Civil Procedure. I have gone round and round with Judge Flanagan in the circuit court of Cook County, who basically doesn't believe that you can bring two motions because you have to, if you're bringing a 619 motion, you are by, you are de facto, as you put it, Justice, admitting the well-pled allegations of the complaint. Isn't she right? She is correct, Your Honor. Okay, so what's the problem? And see, the other thing I must point out is I'm not sure what the, when you bring a 2619.1 motion to dismiss, the statute requires that the motion must be in parts, must be limited to and shall specify that it is made under section, either section 2615 or 2619, must clearly show the points or grounds relied upon under the section upon which it is based. You didn't do any of that. You have four separate grounds in your motion. In three of them, you don't identify either of the sections it's based. And in the third one, it's only in the last line, and I can't tell what you're referring to. Plus, it seems to me that at a minimum, you're referring, when you cited Tom Bruns's allegation as defeating the allegation of duty, which seems to be an argument under 2615, when the trial court ought not be considering the Tom Bruns allegation or affidavit. Again, if that reading is accurate, and I don't have, unfortunately, the motion in front of me, it would seem to be confusing, Judge, to be quite honest with you. I asked Mr. Jones if, for all practical purposes, notwithstanding the peculiar procedural posture of this case, count two is really resolved as if it were a motion for summary judgment, since the trial court seemed to be applying that standard and everyone seemed to be arguing it, even though it was purportedly a dismissal under 2619. That I would agree with. Okay. So is there any prejudice to you or to the plaintiff if we, in fact, evaluate this as if it had been filed as a motion for summary judgment? I don't view any prejudice under that set of circumstances. Okay. You may continue. And Justice Pope made a good point that this knowledge that the plaintiff is trying to impute going to the common law count, it's clear that they have to prove duty, breach, et cetera. The duty issue is really what's at issue here, and not only did Judge Clary grant the motion for summary judgment on the duty issue, but he also granted the summary judgment on a separate and independent basis, that being that there was no evidence in this record that ACWA knew that Sage, the offending dog, was aggressive or had any vicious propensity. In fact, the record is completely devoid of any incidents involving Sage, other than an inadmissible hearsay statement that was made on the night of the dog bite that was not made in the presence of any ACWA personnel, save perhaps Bob Shitwood, but there's certainly no other. What was that statement? Well, there was a statement made by Justin Shitwood to Bob Shitwood's sister. Whether Bob Shitwood was present or not, I don't know. It was not clear from the record, but her recollection was that Justin made a comment that Sage had nipped a friend of his in the past. There's no evidence that this was ever communicated to ACWA. In fact, ACWA, other than one incident where a manager went to play poker at the Shitwood residence and he knew that Sage was there, didn't know that Sage was living there at the time, but in fact had Sage sit at his feet during the entire poker party and allow him to pet him. So I'm not sure if I understand. You referred to it as a hearsay statement, so my question is, is it something which is entitled to very little value in this context of whether summary judgment should have been granted, or is it something which shouldn't have been considered at all by the trial court? First of all, I don't think it was considered by the trial court. It was not made a basis of Judge Clary's ruling at all. Well, but was it part of the materials, evidentiary materials submitted to Judge DeArmond? It was Judge DeArmond, wasn't it, who decided it? Judge DeArmond decided the motion to dismiss Judge Clary. There was a change in judges. They change every year. So by the time the summary judgment got around, it was Judge Clary. Wasn't this statement part of the evidentiary materials submitted to Judge Clary? I don't recall that statement being anywhere in the argument or the briefs. So we don't know whether it was part of the evidentiary materials. We do not, but we do know that it was not part of Judge Clary's articulated reasons on the record at the hearing. Of course, the difficulty, counsel, is you're looking at some 40 years plus cumulative trial court experience here. It's good practice for trial judges always to state for the record what they considered, but it's not required, and it would be better practice for trial counsel to make a record of what they submitted to the trial court to consider. Do we have that? Did either you or Mr. Jones or Mr. Tappel, on behalf of the plaintiff, make clear to the trial court what you were asking the trial court to consider? From my standpoint, I did not argue in any way this hearsay statement because I was responding to their arguments, and I did not raise it, so it was not submitted by me. But you were the movant, so you're the one who's saying, here, Judge, here's all this stuff to consider. And in my presentation to Judge Clary, I did not make reference at all to this hearsay statement because my position was that even if it was made, the ultimate conclusion was we don't know, A, whether it was true, but, B, it is unpersuasive since it involves something that ACWA was never made privy to. This prior event, if it was an event that ---- But then, you see, the reason I'm harping on this is because now we have a difficulty. If this is something that your position was submitted to the trial court to consider and the trial court shouldn't have considered it, the burden should have been on you at the trial level to say, Judge, don't consider that. It's improper, motion to strike or address it in some fashion, so we have a record made that your objection at the trial level was presented to the trial court, and the court says, I'm not going to consider it or I will consider it, one or the other. Even if it was considered by the judge since, Judge Clary, since I won, there was no reason for me to question whether that was part of his ruling or not. That would have been the plaintiff's responsibility. Well, of course, you know, that's after the fact, but, you know, before you won, if you were concerned about the trial courts considering this, a motion to strike, I think, should have been made, and without that, I guess we'll just consider everything that was presented to the court. Go ahead. Back to this control over the entire premises. Again, there is no evidence, and it is undisputed, that ACWA never exercised any control over the garage area, which is the exact location of the dog bite. The thought that because there was a security fence and a gate doesn't mean that ACWA controlled every single person that went in and out because Mr. Chitwood had his own garage door opener type remote that he could use to open the gate, and this was part of Judge Clary's ruling, that on the date in question, it wasn't as if somebody from security came out and checked the IDs to make sure that the plaintiff and the other party guests were on the list. They merely said, into the box at the gate, we're going to see Bob Chitwood, and they were buzzed in without any questions. So this suggestion that somehow this control over the actual gate to get to the house somehow translates to control over the garage, I think is an argument that is extremely unpersuasive. The case law is instructive that we're not looking at control at any time other than at the time of the dog bite and at the location of the incident. And again, that goes into the duty analysis under the common law as well. Under Klitschko v. Helios, almost an identical fact pattern. The court said that there is no duty where there is no retained control over the premises. And in this case, the premises that we're talking about is the garage area of the home. Again, it's undisputed that while ACWA may have plowed the driveway or mowed the grass, they never went into the garage. They didn't store anything in the garage. Mr. Chitwood was free to use the garage in any way that he saw fit. In fact, he had the only garage door openers to the garage, and after his tenancy was terminated, the garage door opener had to be turned over to ACWA. The notion, finally, that all cases must be heard by a jury, I think, flies in the face of the case law. There's several cases cited, obviously, in the briefs I will rely on, where summary judgment was either affirmed or the Klitschko case says that you look at each dog individually.  In the Lucas case, every dog is presumed tame and docile unless there's some evidence to the contrary. And in this case, there was no knowledge that Sage was vicious in any way. Thank you, counsel. Thank you, Your Honor. Mr. Jones, any rebuttal, sir? Yes, please. Okay. Your Honor, just briefly on rebuttal, I want to address the fact that counsel has said that this case, under the Animal Control Act, the Steinberg case is directly on point. Steinberg is the case that Judge Appleton came up with about I own a 60-unit apartment and there's a poodle and there's an accident. Am I on the hook for that? That's what Steinberg is. Steinberg, the landlord, lived four blocks away from where this happened. The landlord said, I didn't even know about the dog. His manager had given the dog owner's permission to build a fence to keep the dog there, and although there had been some complaints about the dogs being noisy and messy made to the manager, the landlord was clearly not in control of that. This case is more like Beggs v. Johnson, which is the case from 2009. In Beggs v. Johnson, it doesn't even involve dogs. It's about horses. And in that case, the homeowner had a paddock area and a barn, but he had given up horses around 2,000. In 2005, he lets his neighbor, Rankin, keep his horses on that property. So it's on the Griffith property, but Mr. Rankin, the neighbor, erects a fence, an electronic fence to keep the horses. He pays to maintain that fence. He maintains the horses with the feed and the grooming and the veterinary care, and the evidence is that Mr. Griffith had no involvement in the raising of these horses. And what happens on this day is the plaintiff comes to look at the property in order to buy it, and Griffith and Rankin are both there, although they don't take part in the showing, but they're both present. And during the showing, the plaintiff is walking around and goes in the horse barn, and for whatever reason, the horses take a run at her, and she gets injured. There is all of the evidence said that the homeowner, Mr. Griffith, had no part in these horses. And what happens in the appellate court is they affirm the jury verdict for the plaintiff, saying under this specific fact scenario, there's enough there to go to the jury and let them decide this issue. And so that's the case we have here. It's not Steinberg. It's Beggs. Mr. Jones, I'm sure you heard the discussion of Mr. Stiff with regard to this statement that he said, first described as hearsay and said that it shouldn't be considered or was lacking value. Was that part of the evidentiary material submitted by the plaintiff in opposition to the defendant's motion for summary judgment? Judge, it's in the deposition transcripts, and all of the depositions were submitted and made part of the record. So it's in there. Was this made clear that this is what you're asking the court to consider, the depositions and which part in opposition to the motion for summary judgment? Judge, no one specified which parts of the depositions should be emphasized. It's a good practice, counsel, to specify what you're giving to the court, both in opposition and in support, to identify the specific evidentiary matters. I agree, Judge. Thank you. Finally, the last thing, this issue of control, and counsel wants you to focus on what happened in the garage. Well, the garage was under the control of ACWA, and that's most clearly seen in the fact that they tossed chitwood out of his residence because of what happened here, and that's an incident that happened in the garage, and Mr. Bruns testified in his deposition, this is the only reason we kicked him out. There was no other reason other than this incident, which is the incident in the garage. Why does that speak to the question of control? It shows that they have leverage over him. They have ability to control what goes on. They gave him an ultimatum in August of that year. It was a month-by-month lease. Correct. And they told him in August of that year that if there's one more incident involving these dogs, and clearly it doesn't matter if it was in the house, outside of the house, anywhere on the ACWA property, we're terminating your tenancy. And that's exactly what happened in this case. They have ongoing control through this incident at the time, and they can say that we didn't have control over that dog, but they could have had him in a pen, they could have gotten rid of the dogs, and chitwood said, if they told me to get rid of the dogs, I would have gotten rid of the dogs. They gave him the opportunity to keep the dogs under their terms, and this is what happened. And because of that, they are on the hook as far as the Animal Control Act is concerned. At least there's issues of material fact that ought to go to the jury, Judge. And for those reasons, we ask that the lower court's verdict be, or reasoning be, overturned, and this case be sent for trial. Thank you. Thank you, counsel. This amendment in advisement be in recess.